Arnold L. Fein, J.
On April 1, 1964, respondent, Samuel Kaiser (Kaiser), entered into an employment agreement with Charles Schlaifer and Company, Inc. (Company), under which Kaiser was to serve as a director and vice-president of the corporation. Employment was to commence on April 27, 1964 and terminate on April 30, 1966. Kaiser was to be paid an annual salary of $35,000 plus a $5,000 expense account.
On March 31, 1964, Kaiser, Victor Sedlow, Herman B. Temple, Charles Schlaifer (Schlaifer), and Company entered into a stock subscription agreement providing in part for the issuance of common stock of the Company, its sole voting stock, to consist of 100 shares to be purchased by the parties at $1 per share, in the following proportions: Kaiser — 15 shares; Schlaifer — 75 shares; and Sedlow and Temple — each 5 shares. This agreement further provided: "At the end of two years each of the Stockholders shall sell their common stock to the Company in the event it has a legal surplus and in the event it does not, then to Charles Schlaifer * * * who hereby agrees to purchase the same for the book value thereof, payable in cash.”
The agreement stated it was executed, "In connection with the employment agreements between” the Company and Kaiser, Sedlow and Temple. Manifestly they must be read together.
Paragraph 4 of the stock subscription agreement provided *819 for repurchase of the shares at "book value”, in "the event of death or disability which results in termination of employment.”
These provisions establish that the agreements were intended to run concurrently. The fact that the stockholder-employees were to purchase their respective proportions of the 100 authorized shares at $1 per share clearly indicated that this was not a subscription agreement to provide the corporation with the necessary capital to carry out the business purposes of the corporation, but rather a device for deferred compensation payable at the end of the employee’s term of employment.
The Company was never recapitalized as provided in the agreement. Nor was the $1 per share paid by Kaiser at the time of the subscription agreement or at any other time. And no certificates of stock were ever issued to Kaiser.
"A certificate, however, is not necessary to make a subscriber to the stock of a corporation a stockholder, whether he becomes such before or after its organization. It is merely evidence of that relation.” (Kohlmetz v Calkins, 16 App Div 518, 520.)
Shares may be issued to directors, officers and employees of a corporation, pursuant to such an agreement, as an incentive to service or continued service provided a majority of the shareholders consent. (Business Corporation Law, § 505, subd [d].)
Kaiser’s employment did not terminate at the end of two years. He continued in Company’s employ until he resigned, effective February 1, 1974. No other written employment or stockholders’ subscription agreement was entered into in the intervening years. During those years he did not request issuance of the stock or payment of its book value.
After his resignation, his attorneys asserted his right to 15% of the Company’s profits for the years of his employment, based upon the stockholders’ subscription agreement. Upon the Company’s denial of his claim and refusal to make its records available, he instituted arbitration proceedings pursuant to the arbitration provisions of each agreement. Petitioners’ application to stay arbitration on the ground his claim was time-barred was denied by order of this court, ruling that the issue of limitation of time was for the arbitrators. The Appellate Division reversed, directing a hearing "to determine *820 if the proceeding is time-barred.” (Matter of Schlaifer v Kaiser, 46 AD2d 850.) This is the decision after such hearing.
To make this determination, it is necessary to examine the purpose and function of the agreement. The objective of the stock subscription agreement, providing for repurchase at book value, was to create and measure a form of deferred compensation. It did not intend that the stock be held after termination of the employee’s employment. Both agreements were co-terminous at the end of two years. They were geared to payment of compensation not to stockholding. Obviously if the Company prospered, the employee would gain at the end of the employment term. As Kaiser was to serve as a director and vice-president of the Company, principally concerned with the creative aspects of the corporation, he personally had an added incentive to see the Company prosper. In effect the agreement entitled Kaiser to what amounted to 15% of the profits, if any, collectible only, however, at the end of the two-year employment period.
Agreements by a corporation to compensate an employee for his future services, in addition to his ordinary salary, by giving the employee a specified share of the business profits or other fringe benefits reasonably related to the services to be rendered are valid and enforceable. (Gallin v Nat. City Bank, 152 Misc 679, 703.) The additional amounts are merely part of the employee’s compensation, bargained for before the services are rendered and thus supported by adequate consideration. (Gray & Co. v United States, 35 F2d 968.) Since the agreement was executed along with the employment contract, to which it referred, and the repurchase price was to be determined by the book value of the corporation at the end of the two-year employment contract, it is manifest that its purpose was such a deferred compensation plan. The stated one-dollar consideration was nominal. Such an agreement by a stockholder to sell back his shares to the Company, entered into contemporaneously with the subscription for the stock, is valid and enforceable (Strodl v Farish-Stafford Co., 145 App Div 406; Richards v Wiener Co., 145 App Div 353, affd 207 NY 59; Hyman v New York Urban Real Estate Co., 79 Misc 439), if the repurchase is made out of surplus and not capital. (Business Corporation Law, § 514.) To overcome this limitation and to accomplish the purpose to provide deferred compensation and not stock ownership, paragraph 4 of the stock , subscription agreement provides, "At the end of two years * * * in the event [the *821 Company does not have a legal surplus] Charles Schlaifer * * * agrees to purchase * * * [the stock] for the book value thereof, payable in cash.”
Thus, Kaiser had an obligation to sell and the Company or Schlaifer had an obligation to purchase Kaiser’s stock at the end of his original two years’ employment, as a means of additional compensation to Kaiser. The claim was ripe and a cause of action accrued for the then book value of the stock. (Ryan Ready Mixed Concrete Corp. v Coons, 25 AD2d 530.) That claim is obviously time-barred, having accrued on April 30, 1966 and the demand for arbitration not having been made until March 20, 1974. It is undisputed that the six-year contract Statute of Limitations applies.
However, this is not dispositive. It is undisputed that Kaiser’s employment continued after April 30, 1966 up until his resignation in February, 1974. Such employment must be held to have been on a year-to-year basis under the terms of the old contract. The general rule is that an employee remaining in his employer’s service after the expiration of a definite term at a stated annual salary continues for another year, under the terms of the old contract, and there is an implied agreement that the employer will continue to pay the employee continuing in his employment the same remuneration specified in the original contract. (Shenn v Fair-Tex Mills, 26 AD2d 282, 283.) Here the employment was for two years at an annual salary of $35,000 and $5,000 annual expenses. And as a practical matter it so continued until Kaiser resigned.
Since the stock subscription agreement, including its sell-back provision, was an integral part of the employment contract as a form of deferred compensation, and Kaiser’s employment was extended by implication on a year-to-year basis after April 30, 1966, the right to the stock and the right to sell it back arose each year until Kaiser terminated his employment with the Company. (Carter v Bradlee, 245 App Div 49, affd 269 NY 664.) Kaiser was entitled to assert his claim at the end of each year. (Ryan Ready Mixed Concrete Corp. v Coons, supra.)
The Statute of Limitations began to run at the end of each year as Kaiser’s cause of action to be paid book value for the stock for that year accrued. Since the employment contract and the stock agreement are to be read together, Kaiser’s right to 15% of the book value arose upon termination of each year of his employment up to February, 1974. The intent of *822 the parties was to effect a form of deferred compensation, the right to which was not to accrue until the particular term of employment terminated. Since the Company’s obligation to pay did not mature until the end of each year, Kaiser’s right to relief for that year did not accrue until he was entitled to assert the claim in the arbitration proceedings. Kaiser could not have brought an action for any particular employment year prior to its termination, since there would have been no cause of action to assert for that year. Unlike Hughes v Eddy Valve Co. (131 NYS 744), relied on by petitioner, there is no evidence of abandonment of Kaiser’s rights or of an agreement not to assert them.
Accordingly it is determined that the six-year Statute of Limitations bars claims asserted by Kaiser for fiscal years ending more than six years prior to service of the demand for arbitration, March 20, 1974. (CPLR 7502, subd [b]; Sovereign Constr. Co. v West Seneca Lumber Co., 41 AD2d 612; see General Precision v Ametek, Inc., 20 NY2d 898.) Kaiser’s right to arbitration of his claims for fiscal years ending less than six years prior to service of his demand for arbitration is not barred by the Statute of Limitations.
The petition is granted only to the extent of staying arbitration of respondent’s claims for fiscal years ending more than six years prior to March 20, 1974 and denied with respect to arbitration of respondent’s claims for fiscal years ending less than six years prior to March 20, 1974.